T.C. Memo. 2020-109

UNITED STATES TAX COURT

MARK WEIDERMAN AND JENNIFER WEIDERMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14432-14.                    Filed July 15, 2020.

<u>Paul M. Vargas</u>, for petitioners.

<u>Steven M. Roth</u>, <u>Jordan S. Musen</u>, and <u>Lori A. Amadei</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, <u>Judge</u>:  By statutory notice of deficiency dated April 16, 2014, respondent determined deficiencies in petitioners' Federal income tax of $31,645 and $23,538 and accuracy-related penalties pursuant to section 6662(a)[1] of $6,329

_____

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

**[*2]** and $4,708 for the 2009 and 2010 taxable years (years at issue), respectively.

The issues for decision are whether petitioners (1) must include in gross income

cancellation of indebtedness (COD) of $255,000 for 2009 and $30,000 for 2010,

(2) are entitled to deduct certain expenses they reported on their 2009 and 2010

Schedules C, Profit or Loss From Business, and (3) are liable for accuracy-related

penalties.[2]  We resolve all issues in respondent's favor.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulation of

facts, the supplemental stipulation of facts, and the attached exhibits are

incorporated herein by this reference.  Petitioners resided in California when their

petition was timely filed with the Court.

I.     Petitioners and Their "W-2" Employment

Since at least 2006 petitioners had been a married couple, but in 2011 they

divorced.  The record does not establish Mr. Weiderman's educational

background, but professionally from 2005 to 2013 he worked full time at New

---

[1](...continued)
Revenue Code (Code) in effect for the years at issue, and all Rule references are to
the Tax Court Rules of Practice and Procedure.  Some monetary amounts are
rounded to the nearest dollar.

[2]In their petition, petitioners assigned error to certain other issues, see Rule
34(b)(4), but, as discussed infra pp. 22-23, did not pursue those issues on brief.

[*3] England Investment and Retirement Group, Inc. (NEIR Group), an investment advisory firm, as a portfolio manager. Mrs. Weiderman is a college graduate, having received a bachelor of science degree in business administration from the University of Richmond and a master's degree in business administration from Virginia Commonwealth University. Since approximately 1990 she has worked in the marketing field.

In 2006 Mrs. Weiderman worked at Stride Rite Corp. (Stride Rite), as vice president of product and marketing, and she and her family lived in Sudbury, Massachusetts. In late 2006 while working at Stride Rite, Mrs. Weiderman began negotiations to accept an executive position at K-Swiss. Following negotiations, by letter dated December 11, 2006, K-Swiss offered Mrs. Weiderman employment as vice president--marketing, directly reporting to the chief executive officer of K-Swiss, and a salary of $25,000 monthly (December 11, 2006, letter). Mrs. Weiderman was required to move to Southern California where K-Swiss was located, and as outlined in the December 11, 2006, letter K-Swiss would (among other things) grant her an interest-free loan of $500,000 to help finance the purchase of a home in that area, provide her up to 180 days of temporary housing in a furnished executive apartment, reimburse her travel expenses for three three-day trips for her and Mr. Weiderman, and pay her moving expenses from

[*4] Massachusetts to California. The December 11, 2006, letter also recited that K-Swiss would pay Mrs. Weiderman six months of salary, i.e., $150,000, as severance compensation if she was terminated without cause before January 1, 2009. On December 13, 2006, Mrs. Weiderman accepted K-Swiss' employment offer and in January 2007 she began working there.

In accordance with the December 11, 2006, letter, K-Swiss granted Mrs. Weiderman the $500,000 loan, which was memorialized by a promissory note dated February 15, 2007, executed by petitioners in favor of K-Swiss (February 15, 2007, promissory note). As stated in the February 15, 2007, promissory note, the loan (or so much thereof as remained outstanding) was due and payable in full in one lump-sum payment on the earlier of February 15, 2017, or the effective date of termination (whether voluntary or involuntary) of Mrs. Weiderman's employment with K-Swiss. Also on February 15, 2007, K-Swiss wired the $500,000 of loan proceeds into petitioners' checking account with Wells Fargo Bank (Wells Fargo).

Meanwhile, petitioners offered to purchase a home in Agoura Hills, California (Agoura Hills property), and this purchase was consummated in February 2007. They paid $1,950,000 for the Agoura Hills property (plus settlement charges and prorated county taxes and homeowner association dues) by

[*5] (1) providing a deposit or earnest money of $50,000, (2) obtaining a $1,450,000 mortgage and a $75,000 bridge loan from Wells Fargo, and (3) providing an additional deposit of $385,993, which was wired into the escrow account established for the purchase from petitioners' Wells Fargo checking account six days after their receipt of the $500,000 loan proceeds via wire transfer.

On March 18, 2007, petitioners sold their home in Sudbury, Massachusetts. They used some of the net proceeds from that sale to pay off the bridge loan.

On December 1, 2008, K-Swiss terminated Mrs. Weiderman's employment. Because her employment was terminated and in accordance with the February 15, 2007, promissory note, K-Swiss demanded that petitioners repay the $500,000 loan. Knowing that the only way they could pay back this loan was to sell the Agoura Hills property and thus concerned about their repayment ability, petitioners listed (with the assistance of a real estate agent) the Agoura Hills property for sale and hired Mary Lee Wegner, a Sherman Oaks, California, employment attorney, to negotiate a settlement with K-Swiss. Initially, K-Swiss offered to cancel $250,000 of the $500,000 loan in lieu of a cash severance payment. Ultimately petitioners agreed to having K-Swiss cancel $220,000 of the loan and pay them $30,000.

**[\*6]** The details of their agreement were memorialized by a separation agreement and general release executed by Mrs. Weiderman and K-Swiss in January and February 2009, respectively (2009 separation agreement), along with a promissory note secured by a deed of trust executed by petitioners on January 29, 2009, in favor of K-Swiss (January 29, 2009, promissory note). As stated in appendix A of the 2009 separation agreement, K-Swiss was obligated to pay Mrs. Weiderman $30,000 in one lump sum without payroll or other deductions on the eighth calendar day after she delivered a signed copy of the 2009 separation agreement to K-Swiss. Additionally, as stated therein, with respect to the $500,000 loan memorialized by the February 15, 2007, promissory note, K-Swiss forgave $220,000 of that debt (leaving a balance owing of $280,000) and would mark that note "Cancelled", and petitioners were obligated to sign (1) a new promissory note for $280,000 in favor of K-Swiss, replacing the February 15, 2007, promissory note and (2) a deed of trust also in favor of K-Swiss and recordable against the Agoura Hills property to secure payment of the $280,000. The January 29, 2009, promissory note reiterated K-Swiss' agreement to cancel the February 15, 2007, promissory note. It also set forth the conditions for repayment of the $280,000; to wit, that the amount would be due and payable in full upon the sale of the Agoura

[*7] Hills property or, if the net proceeds from that sale were insufficient to pay this amount, then the amount would be due on January 31, 2010.

On January 29, 2009, in accordance with appendix A of the 2009 separation agreement, petitioners signed a deed of trust in favor of K-Swiss, securing the $280,000 loan with the Agoura Hills property. Petitioners delivered the signed deed of trust to K-Swiss and K-Swiss recorded it with the Los Angeles County, California, Registrar-Recorder. On February 6, 2009, in accordance with appendix A of the 2009 separation agreement, K-Swiss wired the $30,000 into petitioners' checking account with Bank of America.[3] An unnamed representative of K-Swiss wrote "CANCELLED" across the February 15, 2007, promissory note.

On May 20, 2009, the Agoura Hills property sold for $1,665,000. Shortly before the sale Mrs. Weiderman and K-Swiss agreed to amend the 2009 separation agreement to reflect an additional forgiveness of petitioners' outstanding debt-- this time, $35,000 of the $280,000 loan.

The details of this agreement were memorialized in a May 12, 2009, letter from K-Swiss to Mrs. Weiderman that she countersigned on May 15, 2009 (May 12, 2009, letter). As stated in the May 12, 2009, letter, Mrs. Weiderman's

---

[3]Although the record is silent, we presume that in addition to delivering the signed deed of trust to K-Swiss petitioners delivered a signed copy of the 2009 separation agreement to K-Swiss.

[*8] indebtedness to K-Swiss was reduced from $280,000 to $245,000, with repayment of the $245,000 to occur as follows: (1) $200,000 to be paid upon the sale of the Agoura Hills property and (2) the balance to be paid in two equal installments on January 31, 2010 and 2011, respectively. Additionally, as stated therein, petitioners were obligated to sign a new promissory note to reflect the $245,000 debt.

In accordance with the May 12, 2009, letter petitioners executed an "[a]mended and [r]estated" promissory note for $245,000 in favor of K-Swiss and K-Swiss was paid the $200,000 upon the sale of the Agoura Hills property. Petitioners, however, failed to make the January 31, 2010, installment payment of $22,500. After letters dated February 12 and April 6, 2010, were sent by K-Swiss to Mrs. Weiderman regarding this failure, petitioners retained Carl D. Hasting, an attorney and a certified public accountant (C.P.A.) at CDH Associates, Inc., in Westlake Village, California, as legal counsel to explore settling the outstanding $45,000 debt. In June 2010, as a result of settlement discussions, petitioners and K-Swiss executed a settlement and release agreement whereby petitioners would pay K-Swiss $15,000 and K-Swiss would forgive the remaining $30,000 of outstanding debt (June 2010 settlement agreement). At times not established by the record petitioners and K-Swiss met the terms of this agreement.

**[*9]** From March 2009 to September 2011 Mrs. Weiderman worked at Skechers USA, Inc. (Skechers), as a vice president. Skechers provided her with an office at its corporate offices in Manhattan Beach, California. Mrs. Weiderman traveled as part of her work at Skechers, and Skechers reimbursed her for the expenses she paid in connection with that travel.

II.     Petitioners' Claimed Schedule C Businesses

During 2009 in addition to being a "W-2 wage earner" for NEIR Group, Mr. Weiderman claimed to operate an unnamed unincorporated business that provided investment management services. However, this business, at least during 2009, was solely exploratory. Thus, for 2009 he had no gross receipts or other income attributable to his independent investment management activities; he claimed to have incurred only certain expenses which, as discussed below, petitioners reported on a Schedule C.

During the years at issue in addition to being a "W-2 wage earner" for Skechers, Mrs. Weiderman claimed to operate JW Consulting, an unincorporated business that provided marketing and brand consulting. She claimed to have started this business once she was terminated by K-Swiss. During the years at issue she traveled to trade shows and had meetings with representatives from

**[*10]** several companies (some of which were startup companies),[4] but at least for 2009, she was not hired and paid a fee or given an equity interest in exchange for her services. Thus, for 2009 Mrs. Weiderman had no gross receipts or other income attributable to her consulting activities; she claimed only to have incurred certain expenses which, as discussed below, petitioners reported on a Schedule C. For 2010 she claimed to have gross receipts of $1,000 attributable to her consulting activities; additionally, she claimed to have incurred certain expenses which, as discussed below, petitioners also reported, together with the gross receipts, on a Schedule C. The gross receipts of $1,000 are from Coleman Research Group (CRG), but the record does not establish what services Mrs. Weiderman provided to this company.

---

[4]Sometimes Mrs. Weiderman would pitch her services "at the same time [and] in the same meeting" that Geneva Wasserman would pitch her services. Ms. Wasserman was a public relations consultant who co-owned and operated with another individual WKC Consulting, a company specializing in celebrity endorsements and public relations. Mrs. Weiderman and Ms. Wasserman met sometime in early 2009, after Mrs. Weiderman's employment was terminated by K-Swiss and before she started working at Skechers. Likely in 2010 they collaboratively did some work for a flameless candle company then called Candella; but while Candella paid WKC Consulting for Ms. Wasserman's services, none of that compensation in turn went to Mrs. Weiderman (or JW Consulting).

**[*11]** III.    Petitioners' Tax Reporting

Petitioners prepared and timely filed (with the assistance of Mr. Hasting) their joint Federal income tax returns for the years at issue.  Petitioners provided Mr. Hasting with their credit card statements and an "itemization" of those statements for the years at issue, but the record does not establish what other information they may have provided or disclosed to Mr. Hasting in connection with the preparation of their returns for those years.[5]  As discussed below petitioners later amended their 2009 return (with the assistance of a different tax return preparer).

A.    2009 Return

As relevant here, on their 2009 return petitioners reported wages totaling $289,722 from their employers ($104,920 from NEIR Group, $1,019 from K-Swiss, and $183,783 from Skechers), taxable interest of $10, ordinary dividends of $3,156, a capital loss of $3,000, and unemployment compensation of $2,700. They also reported net business income totaling $164,564 from their claimed Schedule C businesses.  Petitioners did not report the COD income totaling

---

[5]Mr. Hasting did not testify at trial.  We note, however, that while petitioners' Forms W-2, Wage and Tax Statement, for the years at issue were attached to their returns for those years, no other third-party information was attached thereto.

[*12] $255,000 as ordinary income or their receipt of the $30,000 despite K-Swiss' sending the Internal Revenue Service (IRS) and Mrs. Weiderman a Form 1099-MISC, Miscellaneous Income, for 2009, reflecting the $255,000 as nonemployee compensation.[6]  As for the $255,000, as indicated below, they reported this amount on Mrs. Weiderman's 2009 Schedule C as gross receipts attributable to JW Consulting, which was offset by reported business expenses totaling $73,116 (not including reported business expenses related to her use of their home as an office).  In addition to attaching Schedules C to their 2009 return, petitioners attached a Schedule A, Itemized Deductions, claiming itemized deductions consisting of tax paid totaling $26,655, interest paid totaling $25,780, and charitable contributions totaling $21,919.[7]

On Mrs. Weiderman's 2009 Schedule C petitioners reported gross receipts of $255,000 (i.e., the COD income for 2009) and total expenses of $73,116.  The expenses consisted of the following:  (1) $7,520 for advertising, (2) $9,350 for car and truck expenses for driving a 2006 Lexus 17,000 miles, (3) $1,000 for

---

[6]The record does not establish that K-Swiss sent the IRS and petitioners a Form 1099-MISC (or any other form in the Form 1099 series) reflecting the $30,000.

[7]These deductions total $74,354.  However, petitioners' 2009 Schedule A, as well as line 41a of their 2009 return, reflects itemized deductions totaling $71,473.  The record does not explain the discrepancy.

[*13] employee benefit programs, (4) $700 for interest other than mortgage interest, (5) $4,400 for legal and professional services, (6) $4,048 for supplies, (7) $16,930 for travel, (8) $7,432 for meals and entertainment (after reducing the amount by the 50% limitation imposed by section 274(n)), and (9) $21,736 for other expenses, which consisted of $2,136 for a computer and the internet, $1,625 for dues and subscriptions, $1,710 for postage, $13,050 for samples and prototypes, and $3,215 for a phone. On this Schedule C they also reported business expenses of $11,320 for her use of their home as an office, resulting in a net profit of $170,564.

On Mr. Weiderman's 2009 Schedule C petitioners reported no gross receipts and total expenses of $6,000 consisting of other expenses for "Pro Trading Merch and Lic", resulting in a net loss of this aforementioned amount.

B.    2010 Return

As relevant here, on their 2010 return petitioners reported wages of $390,167 from their employers ($107,907 from NEIR Group, $280,529 from Skechers, and $1,731, from which the record does not establish), taxable interest of $171, ordinary dividends of $3, a capital loss of $3,000, and a Schedule C business loss of $36,280 from JW Consulting. They did not report the COD

[*14] income of $30,000.[8]  In addition to attaching a Schedule C for Mrs. Weiderman with respect to JW Consulting, petitioners attached a Schedule A, claiming itemized deductions of $56,221 (consisting of taxes paid totaling $48,532, investment interest of $14, and charitable contributions totaling $7,675).

On Mrs. Weiderman's 2010 Schedule C petitioners reported gross receipts of $1,000 and total expenses of $37,280.  The expenses consisted of the following: (1) $7,500 for car and truck expenses for driving the 2006 Lexus 15,000 miles, (2) $420 for interest other than mortgage interest, (3) $1,000 for legal and professional services, (4) $1,831 for supplies, (5) $10,588 for travel, (6) $1,932 for meals and entertainment (after reducing the amount by the 50% limitation imposed by section 274(n)), and (7) $14,009 for other expenses, which consisted of $615 for a computer and the internet, $1,127 for dues and subscriptions, $1,200 for postage, $9,267 for samples and prototypes, and $1,800 for a phone.

C.    2009 Amended Return

After they filed their 2009 and 2010 returns petitioners began to have questions about how they had reported certain items on their 2009 return. Consequently, on referral from Mrs. Weiderman's financial adviser, in early 2012

---

[8]The record does not establish that K-Swiss sent the IRS and petitioners a Form 1099-MISC (or any other form in the Form 1099 series) for 2010 reflecting this $30,000.

[*15] petitioners engaged Larry Burkholder, then a partner at Ehrenreich, Burkholder & Associates, LLP, a C.P.A. firm in Westlake Village, California. Mr. Burkholder reviewed petitioners' 2009 return and noticed some inconsistencies; to wit, that the $255,000 had been reported on Mrs. Weiderman's 2009 Schedule C when she had received a 2009 Form 1099-MISC from K-Swiss for that amount as well as a 2009 Form W-2 from K-Swiss (for the $1,019 they had reported on their 2009 return as wages Mrs. Weiderman had received from K-Swiss). Mrs. Weiderman informed him that the $255,000 did not pertain to any services she had provided to K-Swiss but rather was an issue of debt cancellation. Petitioners did not provide him with any of the loan documents giving rise to the $255,000. Neither did they provide him with any underlying documents with respect to their claimed Schedule C deductions; in this regard, the discussions he had with them were based on their assurances that they had "bona fide" Schedule C businesses and could support those deductions.

One oral recommendation that Mr. Burkholder made to petitioners was that no Schedules C should be included for 2009 if there were no gross receipts attributable to their Schedule C businesses because otherwise it would be a "red flag" for an IRS audit. Thereafter, on March 7, 2012, he sent petitioners an email following up on this scenario, stating that an IRS audit would be likely because of

[*16] three factors: (1) filing an amended return; (2) the size of refunds requested; and (3) the losses reported on their Schedules C. After considering various options he presented to them, petitioners decided to amend their 2009 return only to change in pertinent part how they had reported the $255,000. On an amended return for 2009 (on which Mr. Burkholder was listed as the paid preparer) they removed the $255,000 of gross receipts from Mrs. Weiderman's 2009 Schedule C and reported this amount as nontaxable COD income, resulting in an overpayment of $88,496. They explained this change in an attachment to this amended return as follows:

> Income from qualified principal residence debt forgiveness from taxpayers' principal residence in the amount of $255,000 was incorrectly reported on the original return as ordinary business income. The $255,000 of mortgage debt forgiveness was incorrectly reported on Form 1099-MISC when the amount should have been reported on Form 1099-C. The $255,000 of qualified principal residence mortgage debt forgiveness has been reported on the amended return on Form 982 as a reduction of the basis of the principal residence.

The IRS received the amended return in April 2012, but the record does not establish that the IRS processed it.[9]

_____

[9]In this regard, we note that the deficiency and penalty determinations as reflected in the April 16, 2014, notice of deficiency to petitioners for the years at issue, as discussed infra, are based on their 2009 return as originally filed (and their filed 2010 return).

[*17] IV.    Audit and Determination

Shortly after petitioners submitted their amended return for 2009, the IRS selected their original 2009 return and their 2010 return for audit.  The audit was conducted by IRS Revenue Agent Brenda Walsh (RA Walsh).  During the audit, through Mr. Burkholder's C.P.A. firm petitioners submitted to RA Walsh information (i.e., expense summaries, a 2009 profit and loss statement for JW Consulting, certain credit card statements and yearend account summaries with handwritten annotations, mileage logs, and calendars with handwritten entries) that did not match the expenses reported on Mrs. Weiderman's Schedules C for the years at issue.  As a result, RA Walsh requested that petitioners provide receipts so that she could determine their correct Schedule C expenses.  They submitted several worksheets (some of which were handwritten) used to calculate their reported Schedule C expenses for the years at issue and certain 2010 invoices/excerpts of bills and checks, including an invoice from Mr. Hasting's firm, endorsed checks made out to Mr. Hasting's firm by petitioners, and excerpts of Time Warner Cable and Verizon Wireless bills; they did not submit any receipts to verify the annotated credit card statements and yearend account summaries.

RA Walsh determined in pertinent part that (1) the $1,000 petitioners reported on Mrs. Weiderman's 2010 Schedule C as gross receipts should be

[*18] taxable "other" income to them and (2) all of petitioners' claimed

Schedule C deductions for the years at issue should be disallowed, except that she

allowed their claimed deduction for other expenses of $6,000 on Mr. Weiderman's

2009 Schedule C as a Schedule A deduction for unreimbursed employee business

expenses (subject to application of the 2% floor of section 67(a)).  She also

determined that (1) the $30,000 petitioners received from K-Swiss in accordance

with appendix A of the 2009 separation agreement was additional taxable "other"

income to them and (2) the amount of petitioners' debt that K-Swiss forgave--

$255,000 for 2009 and $30,000 for 2010--was taxable "other"/COD income to

them.  Finally, RA Walsh determined that accuracy-related penalties for

substantial understatements of income tax, or in the alternative, for negligence

should be imposed.

The April 16, 2014, notice of deficiency to petitioners reflects those

determinations.  The record includes a completed Civil Penalty Approval Form

(along with RA Walsh's "Workpaper #599" dated July 23, 2013 (which the form

references)),[10] for accuracy-related penalties for substantial understatements of

---

[10]We note that RA Walsh's "Workpaper #599" contains some minor typographical errors, including a reference on the first page of the document to the 2003 and 2004 taxable years.  Her audit never encompassed petitioners' returns for 2003 and 2004.  The rest of the four-page document correctly refers to the

(continued...)

[*19] income tax for the years at issue.[11]  The form includes a signature on the line provided on the form for "Group Manager Approval to Assess Penalties Identified Above" dated July 26, 2013, over eight months before the issuance of the notice of deficiency.

OPINION

I.    Burden of Proof

As a preliminary matter we address who has the burden of proof with respect to the various issues in this case.

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  For this presumption to adhere in cases (such as this one) involving unreported income, the U.S. Court of Appeals for the Ninth Circuit, the court to which an appeal of this case would lie absent stipulation by the parties otherwise, see sec.

_____

[10](...continued)
years at issue.

[11]As explained infra pp. 41-45, we are reopening the record to admit the Civil Penalty Approval Form (along with RA Walsh's "Workpaper #599" which the form references) and a declaration of IRS Supervisory Internal Revenue Agent Andrew Hernandez insofar as it authenticates the Civil Penalty Approval Form (and the referenced "Workpaper #599") for purposes of Fed. R. Evid. 902(11).

**[\*20]** 7482(b)(1)(A), has held that the Commissioner must provide some reasonable foundation connecting the taxpayer with the income-producing activity, see Weimerskirch v. Commissioner, 596 F.2d 358, 360-361 (9th Cir. 1979), rev'g 67 T.C. 672 (1977), or demonstrate that the taxpayer received unreported income, see Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97.  Once the Commissioner has done this, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous.  Helvering v. Taylor, 293 U.S. 507, 515 (1935).  Similarly, under section 6201(d), if a taxpayer in any court proceeding asserts a reasonable dispute with respect to any item of income reported on an information return, the Commissioner shall have the burden of producing reasonable and probative information concerning such deficiency, in addition to such information return.

It is undisputed that K-Swiss, Mrs. Weiderman's former employer, wired $30,000 into petitioners' checking account with Bank of America in 2009 in accordance with appendix A of the 2009 separation agreement.  It is also undisputed that petitioners were indebted to K-Swiss and that K-Swiss forgave $255,000 and $30,000 in 2009 and 2010, respectively, of that indebtedness; with respect to the $255,000, K-Swiss sent the IRS and petitioners a 2009 Form

**[\*21]** 1099-MISC, and petitioners' dispute, as discussed below, solely involves whether this amount is taxable COD income to them (and thus not as to the accuracy of the form). On the basis of this undisputed evidence, we are satisfied that respondent has proved that K-Swiss is the source of the aforementioned income petitioners received during the years at issue. Thus, as to the aforementioned income in this case, the burden shifts to petitioners to show that respondent's determinations in this regard were arbitrary or erroneous.

Tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Segel v. Commissioner, 89 T.C. 816, 842 (1987). As relevant here, this burden requires the taxpayer to demonstrate that the claimed deductions are allowable pursuant to some statutory provision and to substantiate the expenses giving rise to the claimed deductions by maintaining and producing adequate records that enable the Commissioner to determine the taxpayer's correct liability.[12] Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001).

---

[12]Petitioners do not otherwise contend that the burden of proof should shift to respondent under sec. 7491(a) as to any relevant issue of fact, nor have they established that they met the requirements for shifting the burden of proof.

[*22] The Commissioner bears the burden of production with respect to accuracy-related penalties under section 6662(a), see sec. 7491(c), but the taxpayer bears the burden of proving that the Commissioner's determinations with respect to the accuracy-related penalties are incorrect, see Rule 142(a); Welch v. Helvering, 290 U.S. at 115; Higbee v. Commissioner, 116 T.C. at 447.

## II.    Failure To Pursue Certain Issues on Brief

On brief petitioners claim only that (1) the amount of their debt that K-Swiss forgave--$255,000 for 2009 and $30,000 for 2010--was nontaxable COD income to them, (2) they are entitled to deduct all the expenses they reported on Mrs. Weiderman's Schedules C for the years at issue, and (3) they are not liable for accuracy-related penalties for the years at issue because they qualify for the reasonable cause defense.  We thus conclude that petitioners have abandoned any argument or contention pertaining to (1) receipt of the $30,000 from K-Swiss in 2009 in accordance with appendix A of the 2009 separation agreement, (2) receipt of the $1,000 from CRG, and (3) the expenses of $6,000 they reported on Mr. Weiderman's 2009 Schedule C.[13]  See McLaine v. Commissioner, 138 T.C.

_____

[13]Even if we had not made this conclusion, the record unmistakably manifests that petitioners received the $30,000 and the $1,000, and we reject any argument or contention that they are entitled to their claimed Schedule C deduction for the expenses of $6,000 as there is not a scintilla of evidence in the

(continued...)

[*23] 228, 243 (2012); Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003)

(and cases cited threat); see also Rule 151(e)(4) and (5) (requiring that a party's

brief set forth and discuss the points and arguments on which the party relies).

III.    Income Adjustments

A taxpayer's gross income includes "all income from whatever source

derived," including COD income.  Sec. 61(a)(12).  "The underlying rationale for

the inclusion of canceled debt as income is that the release from a debt obligation

the taxpayer would otherwise have to pay frees up assets previously offset by the

obligation and acts as an accession to wealth--i.e., income."  Bui v. Commissioner,

T.C. Memo. 2019-54, at *7-*8 (citing United States v. Kirby Lumber Co., 284

U.S. 1, 2 (1931)).

Generally, the amount of COD income that is includible in a taxpayer's

gross income is equal to the face value of the canceled debt minus any amount

paid in satisfaction of the debt.  Rios v. Commissioner, T.C. Memo. 2012-128, slip

op. at 12, aff'd, 586 F. App'x 268 (9th Cir. 2014).  This income is recognized for

the year in which the debt is canceled, Bui v. Commissioner, at *8 (citing

---

[13](...continued)
record to show that they are so entitled.  Additionally, with respect to those
expenses, as we have found, see supra p. 18, respondent in any event allowed them
to be claimed as a Schedule A deduction for unreimbursed employee business
expenses (subject to application of the 2% floor of sec. 67(a)).

[*24] <u>Montgomery v. Commissioner</u>, 65 T.C. 511, 520 (1975)), and is taxed at ordinary rates, <u>Callahan v. Commissioner</u>, T.C. Memo. 2013-131, at *29.

As indicated <u>supra</u> pp. 20-21, petitioners do not dispute that they had COD income of $255,000 and $30,000 for 2009 and 2010, respectively, but contend that these amounts are excludable from their gross income for those years. To be sure, "certain accessions to wealth that would ordinarily constitute income may be excluded by statute or other operation of law." <u>Commissioner v. Dunkin</u>, 500 F.3d 1065, 1069 (9th Cir. 2007), <u>rev'g</u> 124 T.C. 180 (2005). Even so, "given the clear Congressional intent to 'exert . . . the full measure of its taxing power,' * * * exclusions from gross income are construed narrowly in favor of taxation." <u>Id.</u> (quoting <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 429 (1955); and then citing <u>Merkel v. Commissioner</u>, 192 F.3d 844, 848 (9th Cir. 1999), <u>aff'g</u> 109 T.C. 463 (1997)). Petitioners contend that the exclusion provided in section 108(a)(1)(E) for canceled debt that is "qualified principal residence indebtedness" applies to their COD income. We disagree.

Section 108(a)(1)(E) provides that gross income does not include amounts which would be includible as COD income if "the indebtedness discharged is qualified principal residence indebtedness". The term "qualified principal residence indebtedness" is defined as acquisition indebtedness (within the

**[*25]** meaning of section 163(h)(3)(B)) with respect to the taxpayer's principal residence. Sec. 108(h)(2), (5). Section 163(h)(3)(B)(i) provides that acquisition indebtedness is any indebtedness which is (1) incurred in acquiring, constructing, or substantially improving any qualified residence of the taxpayer and (2) secured by that residence. For these purposes, secured debt is any debt that is on the security of any instrument (such as a mortgage, deed of trust, or land contract) that makes the debtor's interest in the qualified residence specific security for the payment of the debt (1) under which, in the event of default, the residence could be subjected to the same priority as a mortgage or deed of trust in the jurisdiction in which the property is situated and (2) is recorded or otherwise perfected in accordance with the applicable State law. Sec. 1.163-10T(o)(1), Temporary Income Tax Regs., 52 Fed. Reg. 48417 (Dec. 22, 1987). In California, the State in which the Agoura Hills property was situated, a mortgage or deed of trust is perfected by recordation of the document at the office of the county recorder. Cal. Civ. Code secs. 1213 and 1214 (West 1989).

In accordance with the December 11, 2006, letter K-Swiss granted Mrs. Weiderman a $500,000 loan to help finance the purchase of a home in Southern California, and petitioners used most of the loan proceeds to purchase the Agoura Hills property. Although the loan was memorialized by the February 15, 2007,

[*26] promissory note, this note did not provide that the indebtedness was secured by the Agoura Hills property.  Additionally, the February 15, 2007, promissory note was not recorded with the Los Angeles County, California, Registrar-Recorder.[14]  The $500,000 loan was therefore unsecured debt.  Since it was unsecured debt, it was not acquisition indebtedness within the meaning of section 163(h)(3)(B)(i), and thus K-Swiss' cancellation of $220,000 of that indebtedness as memorialized by appendix A of the 2009 separation agreement was not cancellation of qualified principal residence indebtedness within the meaning of section 108.

In accordance with appendix A of the 2009 separation agreement petitioners signed the January 29, 2009, promissory note which created an indebtedness of $280,000 in favor of K-Swiss, together with a deed of trust also in favor of K-Swiss and recordable against the Agoura Hills property to secure payment of that new indebtedness.  Although K-Swiss recorded the deed of trust with the Los Angeles County, California, Registrar-Recorder, the $280,000 debt was not "incurred in acquiring, constructing, or substantially improving" the Agoura Hills

---

[14]We note that unlike a mortgage or deed of trust, a promissory note is not recorded in the county land records.  Instead, the lender holds the promissory note while the loan is outstanding; and when the loan is fully paid off, the lender marks the promissory note as paid in full and returns it to the borrower.

**[*27]** property.  Indeed, the January 29, 2009, promissory note conditioned repayment of the $280,000 upon the sale of the Agoura Hills property.  Like the indebtedness of $500,000, the indebtedness of $280,000 was therefore not acquisition indebtedness, and thus K-Swiss' cancellation of $35,000 of that indebtedness as memorialized by the May 12, 2009, letter shortly before the sale of the Agoura Hills property was not cancellation of qualified principal residence indebtedness.

Finally, in accordance with the May 12, 2009, letter, petitioners executed an "[a]mended and [r]estated" promissory note for $245,000 in favor of K-Swiss.  Like the February 15, 2007, promissory note, the note for $245,000 did not provide that the indebtedness was secured by the Agoura Hills property.  Additionally, like the $280,000 debt, the $245,000 debt was not "incurred in acquiring, constructing, or substantially improving" the Agoura Hills property; indeed, similar to the repayment of the $280,000, repayment of ($200,000 of) the $245,000 was conditioned upon the sale of the Agoura Hills property.  The indebtedness of $245,000 was therefore no different from the indebtedness of $500,000 and $280,000--it was not acquisition indebtedness, and thus K-Swiss' cancellation of $30,000 of the outstanding indebtedness to it of $45,000 in

[*28] accordance with the June 2010 settlement agreement was not cancellation of qualified principal residence indebtedness.

We sustain respondent's determination that the COD income of $255,000 and $30,000 for 2009 and 2010, respectively, was gross income to petitioners.

IV.    Business Expense Adjustments

Section 162 allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  Sec. 162(a); sec. 1.162-1(a), Income Tax Regs.  An expense is "ordinary" if it is "normal, usual, or customary" in the taxpayer's trade or business or arises from a transaction "of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940).  An expense is "necessary" if it is "appropriate and helpful" to the taxpayer's business, but it need not be absolutely essential.  Commissioner v. Tellier, 383 U.S. 687, 689 (1966) (quoting Welch v. Helvering, 290 U.S. at 113).  Additionally, a taxpayer may not deduct a personal, living, or family expense unless the Code expressly provides otherwise.  Sec. 262(a).  The determination of whether an expense satisfies the requirements of section 162 is a question of fact.  Cloud v. Commissioner, 97 T.C. 613, 618 (1991) (citing Commissioner v. Heininger, 320 U.S. 467, 473-475 (1943)).

**[*29]** A.     Schedule C Trade or Business Expenses

Whether a taxpayer is engaged in a trade or business is a question of fact to be decided on the basis of all the relevant facts and circumstances. Stanton v. Commissioner, T.C. Memo. 1967-137, aff'd, 399 F.2d 326 (5th Cir. 1968); see also Higgins v. Commissioner, 312 U.S. 212, 217 (1941). Applying this facts and circumstances test, courts have focused on the following three factors indicative of whether a trade or business exists:  (1) whether the taxpayer's primary purpose in undertaking the activity was for income or profit, (2) whether the taxpayer is regularly and actively involved in the activity, and (3) whether the taxpayer's activity has actually commenced. Jafarpour v. Commissioner, T.C. Memo. 2012-165, slip op. at 14 (first citing Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); and then citing McManus v. Commissioner, T.C. Memo. 1987-457, aff'd without published opinion, 865 F.2d 255 (4th Cir. 1988)); see also sec. 183 (generally providing that if an activity is not engaged in for profit, then no deduction attributable to that activity is allowed). Focusing on the first and second factors, the taxpayer's profit motive and the taxpayer's regular and active involvement, regarding the former we accord greater weight to objective facts than to subjective statements of intent, Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(a), Income Tax Regs., and regarding the latter, we have held

**[*30]** that the taxpayer must show extensive business activity over a substantial period rather than a one-time venture or investment, see, e.g., Barker v. Commissioner, T.C. Memo. 2012-77, slip op. at 20 (and cases cited threat); see also Commissioner v. Groetzinger, 480 U.S. at 35.

Petitioners offered no credible, objective evidence to establish a profit motive for Mrs. Weiderman's marketing and brand consulting activities attributable to JW Consulting. Indeed, petitioners did not attempt to rebut their return position for the years at issue concerning these activities; to wit, that she had no gross receipts or other income for 2009, had nominal income for 2010 from a questionable source (i.e., $1,000 from CRG), and only allegedly incurred certain expenses. Except for a 2009 profit and loss statement for JW Consulting, they produced no other records--contracts, accounting records, invoices, and the like--traditionally associated with a business operating for profit.

Additionally, from March 2009 to September 2011 Mrs. Weiderman was employed full time at Skechers as a vice president, and as part of her work there she traveled. "[T]he fact that * * * [the taxpayer] devoted time to another job must be considered." Hawkins v. Commissioner, T.C. Memo. 1979-101, aff'd without published opinion, 652 F.2d 62 (9th Cir. 1981). This employment strongly suggests that she was regularly and actively involved in this employment rather

[*31] than in JW Consulting and that JW Consulting was a sporadic activity. See

Commissioner v. Groetzinger, 480 U.S. at 35 (holding that a sporadic activity does

not qualify as engaging in a trade or business); Trans v. Commissioner, T.C.

Memo. 1999-233 (taxpayer's wages from full-time employment strongly

suggested that he was regularly and actively involved in his full-time employment

rather than in his claimed computer consulting trade or business).

On the basis of the record before us we conclude that Mrs. Weiderman was

not engaged in carrying on a trade or business for profit under section 162.

Petitioners are therefore not entitled to any deductions for Mrs. Weiderman's

marketing and brand consulting activities attributable to JW Consulting for the

years at issue.[15]

_____

[15]Sec. 183(b) does allow a taxpayer two categories of deductions with respect to an activity not engaged in for profit. Strode v. Commissioner, T.C. Memo. 2015-117, at *31. Under sec. 183(b)(1), a taxpayer may deduct expenses attributable to his or her activity to the extent the Code allows them regardless of the taxpayer's profit motive. Id. Under sec. 183(b)(2), a taxpayer may deduct expenses attributable to the activity to the extent that they (1) do not exceed his or her gross income from the activity for that year, reduced by the amount of deductions allowable under sec. 183(b)(1), and (2) would have been allowable under the Code had the activity been engaged in for profit. Petitioners failed to establish that any of the claimed deductions reflected on Mrs. Weiderman's Schedules C for the years at issue do not require a profit motive. Therefore, they are not entitled to any deductions under sec. 183(b)(1). Mrs. Weiderman derived no gross income from her marketing and brand consulting activities with respect to JW Consulting in 2009; and although petitioners reported gross receipts of $1,000

(continued...)

**[\*32]** B.    <u>Substantiation of Schedule C Trade or Business Expenses</u>

Even if we were to find that Mrs. Weiderman engaged in a trade or business for profit for the years at issue, we would ultimately deny petitioners' claimed deductions on Mrs. Weiderman's Schedules C for lack of substantiation.

As we indicated <u>supra</u> p. 21, the burden of substantiating expenses rests with the taxpayer. To this end, under the <u>Cohan</u> rule, if a taxpayer establishes that an expense is deductible but is unable to substantiate the precise amount, the Court may estimate the amount of the deductible expense, bearing heavily against the taxpayer whose inexactitude is of his or her own making. <u>See</u> <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930); <u>see also</u> <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985). In order for the Court to estimate the amount of a deductible expense, the taxpayer must establish some basis upon which an estimate may be made. <u>Norgaard v. Commissioner</u>, 939 F.2d 874, 879 (9th Cir. 1991), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1989-390; <u>Vanicek v. Commissioner</u>, 85 T.C. at 742-743. Otherwise an allowance would amount to

---

[15](...continued) with respect to JW Consulting for 2010, as discussed <u>infra</u> pp. 32-39, they have not adequately substantiated any of the reported expenses attributable to JW Consulting. Consequently, they also are not entitled to any deductions under sec. 183(b)(2).

**[\*33]** "unguided largesse." Norgaard v. Commissioner, 939 F.2d at 879 (quoting Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957)).

The Cohan rule, however, is superseded--that is, estimates are not permitted--for certain expenses specified in section 274; to wit, traveling expenses (including meals and lodging while away from home), entertainment expenses, and "listed property" (including passenger automobile, computer, and, as relevant here, 2009 phone) expenses.[16] Secs. 274(d), 280F(d)(4)(A); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985) (flush language); see Boyd v. Commissioner, 122 T.C. 305, 320 (2004). Instead, these types of expenses are subject to strict substantiation rules. Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., supra. These strict substantiation rules generally require the taxpayer to substantiate with adequate records or by sufficient evidence corroborating the taxpayer's own statement (1) the amount of the expense, (2) the time and place the expense was incurred, (3) the business purpose of the expense, and (4) in the case of an entertainment

---

[16]A taxpayer may deduct passenger vehicle expenses by using either actual cost or the standard mileage rate, provided he or she substantiates the amount of business mileage and the time and purpose of each use. See sec. 1.274-5(j)(2), Income Tax Regs.; Rev. Proc. 2009-54, 2009-51 I.R.B. 930; Rev. Proc. 2008-72, 2008-50 I.R.B. 1286.

[*34] expense, the business relationship between the person entertained and the taxpayer. Balyan v. Commissioner, T.C. Memo. 2017-140, at *7; sec. 1.274-5T(b), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). For "listed property" expenses, in addition to the time such expenses were incurred and their business purpose, the taxpayer must establish the amount of business use and the total use of such property. Balyan v. Commissioner, at *7-*8; sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). Generally, deductions for meals and entertainment expenses are subject to the 50% limitation imposed by section 274(n).

Substantiation by adequate records requires the taxpayer to maintain (1) an account book, diary, log, statement of expense, trip sheets, or similar record prepared contemporaneously with the expenditure and (2) documentary evidence, such as receipts or paid bills, which together prove each element of an expenditure. Balyan v. Commissioner, at *8; sec. 1.274-5(c)(2)(iii), Income Tax Regs.; sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

Petitioners claimed deductions for expenses attributable to JW Consulting for the years at issue in the following categories as reported on Mrs. Weiderman's 2009 and 2010 Schedules C: (1) advertising, (2) car and truck expenses using the

**[\*35]** standard mileage rate, (3) employee benefit programs, (4) interest other than mortgage interest, (5) legal and professional services, (6) supplies, (7) travel, (8) meals and entertainment, (9) other expenses (consisting of a computer, the internet, dues and subscriptions, postage, samples and prototypes, and a phone), and (10) the business use of their home as an office.[17]  Respondent disallowed these deductions in full.

The car and truck, travel, meals and entertainment, computer, and 2009 phone expenses are subject to the strict substantiation rules of section 274(d) and thus they cannot be estimated.  In support of these expenses, petitioners produced at trial the following:  (1) mileage logs prepared by Mrs. Weiderman for the years at issue; (2) calendars with handwritten entries for the years at issue; (3) an auto policy declaration from Liberty Mutual with handwritten notations for the period of April 9, 2009 to 2010; (4) automobile repair invoices from Lexus of Thousand Oaks, California; (5) several worksheets (some of which were handwritten) used to calculate their reported Schedule C expenses for the years at issue; (6) a 2009 profit and loss statement; (7) spreadsheets identifying, categorizing, and summarizing their expenses for the years at issue; (8) certain credit card

---

[17]Petitioners reported the expenses for advertising, employee benefit programs, and Mrs. Weiderman's business use of their home as an office only on her 2009 Schedule C.

[*36] statements and yearend account summaries with handwritten annotations spanning the years at issue; (9) excerpts of various 2009 (and 2010) Verizon Wireless bills; (10) two Staples receipts from 2009 with "Computer" handwritten on them; and (11) a 2009 email from Dell to Mr. Weiderman confirming the purchase of several items. The mileage logs reported most of the miles Mrs. Weiderman drove her Lexus in summary fashion only; to wit, they for the most part did not detail the dates of travel, the names of the events or meetings she attended, and the departure and arrival location. To the extent the mileage logs reported the names of some events and meetings by date and the miles Mrs. Weiderman drove her Lexus, they failed to include the starting location, and these entries did not jibe with the handwritten calendars petitioners submitted. We conclude that the mileage logs are not reliable. As for the excerpts of Verizon Wireless bills, the Staples receipts, and the email from Dell, standing alone they are insufficient to show that Mrs. Weiderman paid computer and phone expenses in connection with her marketing and brand consulting activities attributable to JW Consulting. The credit card statements and yearend account summaries, along with the other documents, standing alone, are also insufficient to show that Mrs. Weiderman had deductible expenses for travel and meals and entertainment; petitioners did not provide receipts to corroborate these expenses; and neither Mrs.

[*37] Weiderman nor Mr. Weiderman testified as to how these claimed expenses had a business purpose or were connected with JW Consulting. Moreover, a review of the credit card statements and yearend account summaries shows that there is no distinction between petitioners' personal living expenses and the expenses reported on Mrs. Weiderman's Schedules C for the years at issue. Indeed, at trial petitioners did not specifically identify which of the numerous expenses reflected in this documentary evidence should be deductible under section 162, and Mrs. Weiderman even acknowledged that some of the expenses reflected therein were personal. See Hale v. Commissioner, T.C. Memo. 2010-229, slip op. at 6 (stating that we need not sort through a taxpayer's evidence "in an attempt to see what is, and what is not, adequate substantiation of the items" on the taxpayer's returns). Accordingly, we conclude that petitioners have not established for the years at issue that they are entitled to deductions for any amount of car and truck, travel, meals and entertainment, computer, or 2009 phone expenses under section 274(d) even if Mrs. Weiderman had engaged in a trade or business for profit during those years. See Fleming v. Commissioner, T.C. Memo. 2010-60, slip op. at 7.

With respect to the remaining business expenses, i.e., the non-section 274(d) expenses, we similarly conclude on the basis of the record that petitioners

**[*38]** would not be entitled to deductions for these expenses in any amounts for the years at issue even if Mrs. Weiderman had engaged in a trade or business for profit. In support of these expenses, petitioners rely in particular on the spreadsheets identifying, categorizing, and summarizing their expenses, their credit card statements and yearend account summaries, and various 2010 Verizon Wireless bills, along with the following: (1) invoices from Ms. Wegner's law firm, (2) endorsed checks made out to Ms. Wegner's law firm by petitioners, (3) excerpts of Charter Communications bills for internet services provided for periods spanning January to July 2009, (4) endorsed checks made out to Shelby Mason by petitioners during the years at issue, (5) an invoice from Mr. Hasting's firm, (6) endorsed checks made out to Mr. Hasting's firm by petitioners, and (7) excerpts of Time Warner Cable bills for periods spanning January to June 2010. The invoices from Ms. Wegner's law firm and Mr. Hasting's firm and the endorsed checks to them are insufficient to support the legal and professional services expenses because the services Ms. Wegner and Mr. Hasting provided concerned the negotiations with K-Swiss, Mrs. Weiderman's former employer, not business related to JW Consulting. As to the other documentary evidence, that documentation standing alone is insufficient to establish that the remaining expenses were even paid let alone attributable to JW Consulting. Neither Mrs.

[*39] Weiderman nor Mr. Weiderman testified as to how the expenses were connected to JW Consulting. And thus, on the basis of the record before us, the Court is unable to make an estimate of the remaining business expenses for the years at issue under the Cohan rule. Accordingly, petitioners have not established that they are entitled to deductions for any amount of the remaining business expenses.

Finally, on Mrs. Weiderman's 2009 Schedule C petitioners claimed a deduction for expenses related to the business use of their home as an office. As relevant here, under section 280A(c)(1), a taxpayer is allowed a deduction for the business use of his or her home as an office if the taxpayer establishes that a portion of his or her dwelling unit is (1) exclusively used, (2) on a regular basis, (3) as the principal place of business for any trade or business that he or she has. At trial petitioners did not introduce any documentary evidence or testify as to Mrs. Weiderman's business use of their home as an office during 2009. Accordingly, on the basis of the record before us we find that petitioners have not met the requirements set forth in section 280A(c)(1) to deduct any home office expenses. See Hamacher v. Commissioner, 94 T.C. 348, 353-354 (1990).

We sustain respondent's determination that petitioners are not entitled to any Schedule C business expense deductions for the years at issue.

**[\*40]** V.    <u>Accuracy-Related Penalties</u>

We now address whether petitioners are liable for accuracy-related penalties.

Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if, as provided by section 6662(b)(1) and (2), the underpayment is attributable to "[n]egligence or disregard of rules or regulations" and/or a "substantial understatement of income tax." For these purposes, "negligence" includes "any failure to make a reasonable attempt to comply" with the internal revenue laws, "disregard" includes "any careless, reckless, or intentional disregard", and an understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return for that taxable year or $5,000. Sec. 6662(c) and (d)(1)(A).

As indicated <u>supra</u> p. 22, the Commissioner bears the burden of production with respect to an individual taxpayer's liability for accuracy-related penalties. Sec. 7491(c); <u>Higbee v. Commissioner</u>, 116 T.C. at 446. In <u>Frost v. Commissioner</u>, 154 T.C. __, __ (slip op. at 20) (Jan. 7, 2020), we recently held that the Commissioner's initial burden of production under section 7491(c) includes producing evidence that he has complied with the procedural requirements of section 6751(b) and that once he has satisfied this initial burden

[*41] the taxpayer must come forward with contrary evidence. Section 6751(b)(1) requires that the initial determination of certain penalties be "personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." See Graev v. Commissioner (Graev III), 149 T.C. 485, 492-493 (2017), supplementing and overruling in part Graev v. Commissioner (Graev II), 147 T.C. 460 (2016); see also Clay v. Commissioner, 152 T.C. 223, 248 (2019) (quoting section 6751(b)(1)). In Belair Woods, LLC v. Commissioner, 154 T.C. __, __ (slip op. at 24-25) (Jan. 6, 2020), we recently held that "the 'initial determination' of a penalty assessment * * * is embodied in the document by which the Examination Division formally notifies the taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties."

Trial of this case was held, and the record was closed, before we issued Graev III and overruled in part Graev II (and issued Clay, Belair Woods, and Frost). In the light of Graev III we ordered respondent to file a response addressing the effect of section 6751(b) on this case and directing the Court to any evidence of section 6751(b) supervisory approval in the record and petitioners to respond. Respondent was unable to direct the Court to any evidence in the record that satisfies his burden of production with respect to section 6751(b)(1) and filed

**[\*42]** a motion to reopen the record to offer into evidence (1) the declaration of Mr. Hernandez and (2) the Civil Penalty Approval Form for the years at issue dated before the issuance of the notice of deficiency and signed by Mr. Hernandez, along with RA Walsh's "Workpaper #599" that the form references. Petitioners objected to the introduction of any additional evidence with respect to the penalties and requested that the Court deny respondent's motion.

Reopening the record for the submission of additional evidence lies within the Court's discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); Butler v. Commissioner, 114 T.C. 276, 286-287 (2000); see also Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 363 (9th Cir. 1974) ("[T]he Tax Court's ruling [denying a motion to reopen the record] is not subject to review except upon a demonstration of extraordinary circumstances which reveal a clear abuse of discretion."), aff'g T.C. Memo. 1971-200. We will not grant a motion to reopen the record unless, among other requirements, the evidence relied on is not merely cumulative or impeaching, is material to the issues involved, and probably would change some aspect of the outcome of the case. Butler v. Commissioner, 114 T.C. at 287; see also SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986) (explaining that the trial court "should take into account, in considering a motion to hold open the trial record, the character of the additional * * * [evidence] and

**[\*43]** the effect of granting the motion"), abrogated on other grounds by Pinter v. Dahl, 486 U.S. 622 (1988).

In reviewing motions to reopen the record, courts have considered when the moving party knew that a fact was disputed, whether the evidentiary issue was foreseeable, and whether the moving party had reason for the failure to produce the evidence earlier. See, e.g., George v. Commissioner, 844 F.2d 225, 229-230 (5th Cir. 1988) (and cases cited threat) (holding that refusal to reopen the case was not an abuse of discretion because the issue was foreseeable to the taxpayers and the court could see no excuse for the taxpayers' failure to produce evidence earlier), aff'g Frink v. Commissioner, T.C. Memo. 1984-669. We also balance the moving party's diligence against the possible prejudice to the nonmoving party. In particular we consider whether reopening the record after trial would prevent the nonmoving party from examining and questioning the evidence as it would have during the proceeding. See, e.g., Estate of Freedman v. Commissioner, T.C. Memo. 2007-61; Megibow v. Commissioner, T.C. Memo. 2004-41.

The evidence that is the subject of respondent's motion would not be cumulative of any evidence in the record and would not be impeaching material. Respondent bears the burden of production with respect to penalties and would offer the evidence as proof that the requirements of section 6751(b)(1) have been

**[\*44]** met.  The subject evidence is material to the issue of the penalties here, and the outcome of that issue will be changed if we grant respondent's motion.

Petitioners contend that "[r]espondent had ample time to provide the documents prior to trial and refused to do so."  They also note that on the basis of a telephone conversation between counsel for the parties on or about August 4, 2017, they understood that respondent did not wish to file a motion to reopen the record.  When this case was submitted and the record closed, Graev III (as well as Clay, Belair Woods, and Frost) had not been issued.  As for any understanding that petitioners claim to have had as to respondent's intentions with respect to filing a motion to reopen the record, such an understanding was (or should have been) negated when on December 26, 2017, nearly five months after the aforementioned alleged telephone conversation, the Court ordered respondent and petitioners to file responses addressing the effect of section 6751(b) on this case; respondent timely filed such a response stating that he was unable to direct the Court to any evidence in the record that satisfied his burden of production with respect to section 6751(b) and that he therefore would be filing a motion to reopen the record to introduce such evidence into the record (which he did four days later).  We agree with respondent that the Civil Penalty Approval Form (along with RA Walsh's "Workpaper #599", which the form references) are not

**[\*45]** cumulative and are material to the penalty issue in this case. We also agree with respondent that the Civil Penalty Approval Form (and the referenced "Workpaper #599") are records kept in the ordinary course of a business activity and are authenticated by the declaration of Mr. Hernandez. See Fed. R. Evid. 803(6), 902(11). We will admit the Civil Penalty Approval Form (and the referenced "Workpaper #599") into evidence and the declaration for purposes of authentication under rule 902(11) of the Federal Rules of Evidence. See Clough v. Commissioner, 119 T.C. 183, 190-191 (2002).

We now must decide whether respondent's evidence showing that certain penalties were approved before a formal communication of the penalties to petitioners is sufficient to satisfy his initial burden of production. See Frost v. Commissioner, 154 T.C. at __ (slip op. at 21). The April 16, 2014, notice of deficiency formally communicated the assertion of accuracy-related penalties to petitioners, and the Civil Penalty Approval Form was signed by Mr. Hernandez on July 26, 2013, over eight months before the April 16, 2014, notice of deficiency. Consequently, we hold that respondent has introduced evidence that written supervisory approval of penalties was given before a formal communication of the penalties to petitioners and that the evidence is sufficient to carry his initial burden of production under section 7491(c) to show that he complied with the procedural

[*46] requirements of section 6751(b). Because the Civil Penalty Approval Form indicated approval of penalties for substantial understatements of income tax but not for negligence, respondent has not satisfied his burden as to the penalties for negligence.

The burden now shifts to petitioners to offer evidence suggesting that written supervisory approval of the substantial understatement penalties was untimely--e.g., that there was a formal communication of these penalties before the proffered approval. See Frost v. Commissioner, 154 T.C. at __ (slip op. at 22). Petitioners have not claimed, nor does the record support a conclusion, that respondent formally communicated his initial penalty determination to petitioners before July 26, 2013, the date that Mr. Hernandez signed the Civil Penalty Approval Form. We therefore hold that the substantial understatement penalties here were approved in writing before the first formal communication to petitioners of those penalties. See id. at __ (slip op. at 23) (citing Clay v. Commissioner, 152 T.C. at 249).

Respondent having complied with the requirements of section 6751(b)(1), we now turn to the remainder of his initial burden under section 7491(c), i.e., whether he has provided sufficient evidence showing that petitioners' understatements of income tax for the years at issue exceed the greater of 10% of

[*47] the tax required to be shown on their returns for those years or $5,000. Petitioners' income tax was understated by $31,645 and $23,538 for 2009 and 2010, respectively. As determined in the April 16, 2014, notice of deficiency to petitioners, their understatements of income tax for the years at issue were substantial. Respondent has met his burden of producing evidence that petitioners' underpayments for the years at issue were attributable to substantial understatements of income tax. The burden then shifts to petitioners to come forward with persuasive evidence that the substantial understatement penalties are inappropriate because, for example, they had reasonable cause for their underpayments and acted in good faith. See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 446-447.

The determination whether the taxpayer had reasonable cause and acted in good faith depends upon the pertinent facts and circumstances of a particular case. Sec. 1.6664-4(b)(1), Income Tax Regs. We consider, among other factors, the experience, education, and sophistication of the taxpayer, and the taxpayer's reliance on the advice of a professional. Id. Reasonable cause may exist where the taxpayer relies on professional advice if the taxpayer proves by a preponderance of the evidence that: (1) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him or her;

**[*48]** (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976) ("While a taxpayer's reliance upon his accountant to prepare accurate returns may indicate an absence of fraudulent intent, * * * this is true in the first instance only if the accountant has been supplied with all the information necessary to prepare the returns.").

Petitioners contend that they qualify for the reasonable cause defense because they relied on tax professionals to prepare their returns for the years at issue--Mr. Hasting for their original returns for the years at issue and Mr. Burkholder for their amended return for 2009. Their contention lacks merit. Simply employing tax return preparers for the years at issue does not permit petitioners to avoid accuracy-related penalties. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99. Furthermore, petitioners provided Mr. Hasting with scant financial and tax information for the years at issue. The record establishes that petitioners merely provided him with their credit card statements and an "itemization" of those statements for the years at issue but nothing more, and he was not called as a witness to explain the decision-making and preparation

[*49] process with respect to petitioners' original returns for the years at issue. Mr. Burkholder did testify at trial on respondent's behalf; he averred that petitioners disclosed limited information to him concerning their 2009 Schedules C and the COD income for 2009 and that he gave them a range of options with respect to amending their 2009 return, leaving the decision to them as to what income and expense items for 2009 should be corrected.[18] We therefore find that petitioners did not rely on the judgment of either Mr. Hasting or Mr. Burkholder (let alone reasonably rely on their "judgment"), nor did they act in good faith. Petitioners have failed to prove that they had reasonable cause for their underpayments within the meaning of section 6664(c). Accordingly, we sustain respondent's determination regarding the substantial understatement penalties for the years at issue.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

---

[18]We also question in any event the relevance of petitioners' claimed reliance on Mr. Burkholder as the accuracy-related penalties are based on adjustments made to their original returns for the years at issue--returns that, as we have found supra p. 11, were prepared by Mr. Hasting, not Mr. Burkholder.

**[\*50]** To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.
